J-S77029-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: F.M.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF D.D.M., MOTHER | : | |
| | : | No. 1616 EDA 2014 |
| | : | |

Appeal from the Decree entered April 22, 2014,
in the Court of Common Pleas of Philadelphia County,
Family Court Division, at Nos. CP-51-AP-0000145-2014,
and CP-51-DP-0000529-2013

BEFORE: STABILE, JENKINS, AND STRASSBURGER[*], JJ.

MEMORANDUM BY JENKINS, J.:          **FILED FEBRUARY 03, 2015**

D.D.M. (Mother), appeals from the decree of the Court of Common Pleas of Philadelphia County, entered on April 22, 2014, that terminated her parental rights to her daughter, F.M.B. (Child), born in November of 2012. We affirm.[1]

Mother gave birth to Child on November 8, 2012. On November 9, 2012, Philadelphia's Department of Human Services (DHS) received a substantiated General Protective Services (GPS) report alleging that Mother and Child had both tested positive for cocaine.[2] The GPS report claimed

---

[*]    Retired Senior Judge assigned to Superior Court.

[1]    The trial court also terminated the parental rights of J.B., Child's father (Father).  Father did not appeal that termination and is not a party to this appeal.

[2]    At trial, counsel for Mother stipulated that, if called to testify, DHS witnesses would testify in accordance with the facts set forth in the Statement of Facts attached as Exhibit A to DHS's petition to terminate

Mother had admitted to a history of substance abuse during the preceding six years.[3]  The GPS report also stated that Mother was taking benzodiazepines for diagnosed anxiety.

Through a consensual family agreement, Child went to reside with G.S.H., her godmother.  On January 22, 2013, DHS implemented In-Home Protective Services for Child with the godmother through the Juvenile Justice Center.[4]

On January 30, 2013, DHS conducted a Family Service Plan meeting attended by Mother and Father that set forth the following basic objectives for the parents: (1) to provide appropriate supervision for Child; (2) to properly clothe and clean Child; (3) to participate in drug and alcohol evaluations; and (4) to comply with all drug and alcohol treatment recommendations.  Both parents signed the Family Service Plan.

On February 11, 2013, Mother entered intensive outpatient substance abuse treatment at NHS Parkside Recovery in Germantown, Pennsylvania.

_____

Mother's parental rights.  N.T. 4/22/14, at 6.  That Statement supports this recitation of the facts.

[3] In 2006, upon the birth of Child's older sibling, DHS received a substantiated report alleging that Mother had a history of using controlled substances and that she was not in treatment at that time.

[4] Ultimately, following the termination of the DHS In-Home Protective Services, Child remained with the godmother, who provided pre-adoptive foster care through an organization called Volunteers of America.  *See* N.T. 4/22/2014, 9.

Three weeks later, on March 8, 2013, NHS Parkside negatively discharged Mother for missing seven consecutive days of treatment.

Also on March 8, 2013, DHS learned that Mother had been evicted from her last known address.

Due to Mother's noncompliance with substance abuse treatment, and because she lacked stable housing, on March 13, 2013, DHS obtained an Order of Protective Custody for Child to ensure Child's safety and wellbeing. Child continued to reside in foster care with the godmother.

The trial court appointed counsel for Mother at a March 15, 2013 shelter care hearing. The trial court adjudicated Child dependent on March 25, 2013, and committed Child to DHS's care. At the same hearing, the trial court referred Mother to the Clinical Evaluation Unit for an evaluation and drug and alcohol screen with orders to comply with all Family Service Plan objectives, services, and recommendations. The trial court granted Mother supervised weekly visits with Child with a goal of reunification. Accordingly, the court further ordered Mother to attend a reunification program conducted by the Achieving Reunification Center.

Upon reporting to the Clinical Evaluation Unit, Mother tested positive for cocaine and opiates. Although the Clinical Evaluation Unit staff verified that Mother had been treating at NHS Parkside Recovery, Mother's Parkside therapist was unable to provide the Clinical Evaluation Unit with any details

regarding Mother's treatment because Mother refused to sign the required release forms.

On April 24, 2013, DHS conducted a second meeting to develop Family Service Plan objectives for Mother. Mother did not attend. In her absence, DHS developed the following Family Service Plan objectives for Mother: (1) to meet with the Juvenile Justice Center on a weekly basis to learn expected child behavior; (2) to obtain appropriate housing; (3) to sign appropriate authorization forms allowing the release of medical evaluations and reports regarding her sobriety and mental health; (4) to comply with all treatment recommendations; and (5) to maintain visitation with Child. To help her achieve these objectives, DHS referred Mother to the Achieving Reunification Center for parenting and housing services, the Juvenile Justice Center for parenting services, and the Clinical Evaluation Unit for drug/alcohol and mental health treatment.

Thereafter, DHS learned that NHS Parkside had readmitted Mother for outpatient substance abuse treatment. DHS additionally learned that Mother had consistently tested positive for opiates, cocaine, and/or marijuana throughout treatment, had missed twelve days of medication in June of 2013 and five days of medication in the first two weeks of July of 2013, and had met with her counselor only once. NHS Parkside had placed Mother on a behavioral contract by which she risked discharge from the program if she failed to attend all scheduled group and individual sessions.

NHS Parkside staff recommended that Mother move to inpatient treatment at My Sister's Place to aid in her struggle to maintain her sobriety as an outpatient. NHS Parkside personnel envisioned Mother returning to outpatient status at NHS Parkside after the inpatient treatment.

Accordingly, Mother was admitted to My Sister's Place for inpatient treatment on October 1, 2013. However, My Sister's Place discharged Mother as absent without leave nineteen days later when she walked out of the facility and did not return.

The Juvenile Justice Center likewise negatively discharged Mother effective October 16, 2013.

The trial court conducted a permanency hearing on November 25, 2013. At the hearing, the trial court received into evidence a Clinical Evaluation Unit report of Mother's noncompliance with the court's ordered drug and alcohol evaluations. Additionally, the court heard testimony that Mother did not receive substance abuse treatment, only made five out of ten scheduled supervised visits with Child, had not obtained appropriate housing, and did not attend the Achieving Reunification Center's reunification program. The trial court modified Mother's visits with Child to once weekly, supervised at DHS.

At a December 30, 2013 Family Service Plan meeting, DHS changed Child's goal from reunification to adoption. On March 21, 2014, DHS filed

petitions seeking the termination of Mother and Father's parental rights and a goal change to adoption.

The trial court conducted a hearing on the petitions on April 22, 2014. Mother failed to appear. Mother's counsel stipulated to DHS's documentation that Mother had been properly served with notice of the hearing and the order to attend. A social worker testified that she had personally handed Mother notice of the hearing. N.T. 4/22/14 (N.T.), at 14.

Counsel for Mother and DHS stipulated to the facts giving rise to the filing of the petitions and to the DHS documents supporting those facts that were admitted into evidence. N.T., at 6. DHS further provided the testimony of social workers, Rachel Brown and Aleah Frazier. Counsel for Mother presented no evidence on her behalf. Accordingly, the evidence presented was uncontroverted. N.T., at 15.

The trial court entered its decree terminating Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8) and (b), and changing Child's goal to adoption on April 22, 2014. Mother filed her notice of appeal and statement of errors complained of on appeal on May 22, 2014.

Mother raises the following questions on appeal:

1. Was mother deprived of a fair hearing as she was unable to appear at the Goal Change Termination Hearing?

2. Was mother denied effective representation as DHS and/or its agents withheld information from [M]other's counsel as counsel did not know the reason [M]other was unable to appear at the hearing?

3. Did the [trial court] fail to make a searching inquiry as to the best interest[s] of [Child] when terminating [M]other's parental rights?

Mother's Brief, at 5.

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super.2004) (citations omitted).

In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a), in addition to

subsection (b).  ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa.2004).

23 Pa.C.S. § 2511 governs requests to terminate a natural parent's parental rights, and provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa.Super.2004).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the

filing of the petition, the parent's conduct demonstrated a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super.2003).

> With respect to subsection 2511(a)(1), our Supreme Court has held:
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa.1988). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa.Super.2004) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Although the Act does not specifically refer to the necessity of an evaluation of the bond between parent and child, our case law requires an evaluation of any such bond. *See In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993). However, this Court has held that neither statute nor precedent require a trial court to order that an

- 10 -

expert perform a formal bonding evaluation. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa.Super.2008). Further, as this Court has explained:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa.Super.2008) (internal citations omitted).

In her first two issues, Mother claims that she was denied a fair hearing and effective counsel because the social workers withheld from her counsel the fact that she was unable to attend the hearing due to her participation in in-patient drug treatment. No evidence supporting these allegations appears in the trial court record. Instead, the trial court record establishes that Mother received proper service and notice of the hearing and that she failed to appear without explanation. Accordingly, Mother's first two issues are without merit.

In Mother's third issue, she claims that the trial court failed to make an appropriate inquiry into Child's best interests when it terminated her parental rights. In support of this claim, Mother argues that the trial court was unable to make such an inquiry because Mother was not present at the hearing to testify regarding her efforts to complete the Family Service Plan objectives. This claim lacks merit. Mother had notice of the hearing and did

not appear. Therefore, Mother cannot benefit by any limitations created by her own unexplained failure to appear and testify. Further, even had Mother appeared and testified credibly that she was making diligent efforts to complete her Family Service Plan, the trial court would not have been able to consider that testimony. In a proceeding to terminate parental rights, the focus of our inquiry rests upon the period at least six months *prior* to the filing of the petition to terminate her parental rights. **M.E.P.**, **supra**. The fact that Mother might have been working toward the completion of her family service plan objectives at the time of the hearing would have had no bearing on the trial court's analysis of her case.

We turn now to the merits of the trial court's determination to terminate Mother's parental rights. DHS presented evidence that, in at least the six months prior to the filing of its petition, Mother had not complied with the permanency plan and had not met any of her Family Service Plan objectives. Mother had not followed through with the Clinical Evaluation Unit's recommended dual diagnosis services and had been discharged from the Achieving Reunification Center reunification program for lack of participation. Mother had not completed the parenting course at Juvenile Justice Center, and had not secured appropriate housing. N.T., at 8. Mother's visitation with Child was inconsistent. In the five months since the previous court date of November 25, 2013, Mother attended only four of the twenty scheduled weekly visits. **Id.**

Further, Ms. Frazier, who supervised the visits, testified that Mother did not share a bond with Child and that Child did not recognize Mother as her mother. N.T., at 8. According to Ms. Frazier, Mother was just someone who "comes to see her and they walk around and play." *Id.* at 12-13. Both Ms. Frazier and Ms. Brown agreed that severing Mother's parental rights would not cause Child any emotional harm and that termination of those rights was in Child's best interest. N.T., at 10, 13. Further, Ms. Brown testified that Child had bonded with her foster parent – the godmother – with whom she had resided during her entire placement, and that the godmother was willing to adopt Child. *Id.* at 9-10.

Our review of the record reveals that the trial court's decision to terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1) and (b), and to permit Child's adoption without notice to or consent from Mother, is supported by clear and convincing evidence, and that the trial court did not abuse its discretion in so ordering.

Decree affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/3/2015

- 13 -